<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

<table>
<tr><td>

NORTHFIELD INSURANCE COMPANY,

      *Plaintiff,*

      v.

PRIME INSURANCE COMPANY,

      *Defendant*.

</td><td>

Civil Action No. 23-23345

**OPINION**

March 30, 2026

</td></tr>
</table>

**SEMPER**, District Judge.

      **THIS MATTER** comes before the Court on (1) Defendant Prime Property & Casualty Insurance, Inc.'s ("Defendant" or "Prime") motion for summary judgment (ECF 21, "Defendant's Motion") and (2) Plaintiff Northfield Insurance Company's ("Plaintiff" or "Northfield") cross-motion for summary judgment. (ECF 23, "Plaintiff's Motion.") The parties opposed each respective motion. (ECF 23; ECF 24, "Prime Opp.") Northfield also filed a reply brief. (ECF 25, "Northfield Reply.") The Court reviewed the parties' submissions and decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated below, Plaintiff's motion for summary judgment is **DENIED** and Defendant's motion for summary judgment is **DENIED**.

     **I.**     <u>**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**</u>[1]

---

[1] The facts and procedural history are drawn from Defendant's brief in support of its motion for summary judgment (ECF 21-1, "Prime Br."), Plaintiff's brief in support of its motion for summary judgment (ECF 23-1, "Northfield Br."), Defendant's brief in opposition (ECF 24), Plaintiff's brief in reply (ECF 25), and the parties' submissions of undisputed material facts (ECF 21-2, "DSMF"; ECF 23-3, "PSMF") and responses to the submissions of undisputed material facts (ECF 22 (Plaintiff's Response to DSMF); ECF 24-1 (Defendant's Response to PSMF)).

The present lawsuit arises from a dispute over whether Defendant Prime owed an obligation to defend and indemnify its insured, BCM Relocation, LLC ("BCM"), for claims asserted in a personal injury lawsuit captioned *Toby Wander v. BCM Relocation, LLC et al.*, Case No. FST-CV21-6054338-S, in the Superior Court of Connecticut ("the Underlying Action"). Plaintiff Northfield seeks reimbursement from Prime for the defense and indemnity costs that Northfield incurred in defending the Underlying Action on BCM's behalf. (*See* ECF 1, "Compl." or "Complaint" ¶ 1; Prime Br. at 1.)

### A. The Northfield Policy

BCM's business involved moving items for customers. (*See* DSMF ¶ 7.) During the time period relevant to this action, BCM had two different insurance policies relevant here: one issued by Northfield, and one issued by Prime. (DSMF ¶ 1; PSMF ¶ 1.) Northfield issued policy WS465496, in effect between April 13, 2021 and April 13, 2022, to BCM (the "Northfield Policy") (ECF 23-2, Certification of Michael E. Buckley ("Buckley Cert.") Ex. A; PSMF ¶ 1.) The Northfield Policy was for "commercial general liability coverage" (Buckley Cert. Ex. A.) Under the Northfield Policy, "auto" is defined as:

> a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
>
> b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

(Buckley Cert. Ex. A at 31 & Ex. C.)

In endorsement S267-CG (6/14), the Northfield Policy defines "loading and unloading" as follows:

> "Loading or unloading" means the handling of any person or property:
>
> a. After it is moved from the place where the person or property is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While in or on an aircraft, watercraft or "auto"; or

c. While being moved from an aircraft, watercraft or "auto" to the place where the person or property is finally delivered.

However, "loading or unloading" does not include the movement of any person or property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

(Buckley Cert. Ex. C at 2.) Endorsement S2582-CG (1/13) of the Northfield Policy contains an exclusion titled "EXCLUSION – AIRCRAFT, AUTO OR WATERCRAFT" associated with "loading or unloading" activity undertaken by an insured "auto" which states that "[t]his endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART[.]" (*Id.* at 3.) The exclusion further states, in pertinent part,

1. The following replaces Exclusion g., Aircraft, Auto or Watercraft, of SECTION I – COVERAGES – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY;

    g. Aircraft, Auto Or Watercraft

    "Bodily injury" or "property damage" arising out of ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured, an agent of any insured, or an independent contract providing services for or on behalf of any insured. Use includes operation and "loading or unloading"[.]

    This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured, an agent of any insured, or an independent contractor providing services for or on behalf of any insured[.]

(*Id.*)

### B. The Prime Policy

Prime issued a commercial auto insurance policy to BCM on March 22, 2021, Policy No.

PC21032316, for the policy period of March 22, 2021, to March 22, 2022 (the "Prime Policy," and together with the Northfield Policy, the "Policies"). (DSMF ¶ 1; ECF 21-4, Certification of Sean P. Shoolbraid ("Shoolbraid Cert.") Ex. A.) The Prime Policy's Covered Autos Liability Coverage provides that:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

(DSMF ¶ 2; Shoolbraid Cert. Ex. A at 8.) The Prime Policy's Loss Conditions provide the following in relevant part:

> 2. **Duties In The Event Of Accident, Claim, Suit Or Loss**
>
> We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:
>
> a. In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:
>
>> (1) How, when and where the 'accident' or loss occurred;
>> (2) The insured's name and address; and
>> (3) To the extent possible, the names and addresses of any injured persons and witnesses.
>
> b. Additionally, you and any other involved "insured" must:
>
>> (1) Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.
>> (2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".
>> [….]

(DSMF ¶ 3; Shoolbraid Cert. Ex. A at 14.)

The Prime Policy also contains a "Handling of Property" exclusion, which states that the Prime Policy does not apply to the following:

> **7. Handling Of Property**
>
> "Bodily injury" or "property damage" resulting from the handling of property:

   a. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

   b. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured."

(DSMF ¶ 4; Shoolbraid Cert. Ex. A at 10.)

### C. The Underlying Action

On November 3, 2021, suit was filed in a lawsuit captioned *Toby Wander v. BCM Relocation, LLC and Park Tower Stamford Association, Inc.*, docket number FST-CV21-6054338-S. (DSMF ¶ 5; Shoolbraid Cert. Ex. B.) The complaint in the Underlying Action alleged that on July 9, 2021, BCM was engaged in moving a resident on the twenty-second floor of the Park Tower Stamford. (Shoolbraid Cert. Ex. B. ¶ 4.) The Plaintiff in the Underlying Action, Toby Wander, was a resident of the twenty-second floor of the Park Tower Stamford. (*Id.* ¶ 1.) Wander further alleged that BCM, its agents, servants, and/or employees had placed Masonite material on the hallway floor of the twenty-second floor. (*Id.* ¶ 5). Wander alleged that she was "walking in the hallway of the twenty-second floor walking towards her residence" when her "left shoe caught in a gap between two pieces of Masonite," causing her to fall; she "land[ed] hard on the floor landing [sic] on her left side." (*Id.* ¶¶ 6-8.) Wander alleged that she suffered several injuries from her fall and incurred medical expenses. (*Id.* ¶¶ 9-11.) Wander alleged that BCM was negligent in placing the Masonite on the floor. (*Id.* ¶ 13.) Wander also sued Park Tower Stamford Association, Inc. for negligence. (*See id.* at Count 2.)

At deposition, Wander testified that "[i]t was her understanding that the Masonite had always been provided by the building [Park Tower]." (*See* Shoolbraid Cert. Ex. C at 18:20-24.) Wander further testified that there was a "huge amount of furniture, boxes, men shouting" on the twenty-second floor of Park Tower Stamford at the time of her July 9, 2021 fall. (*See* Buckley

Cert. Ex D. at 15:21-16:2.) In a recorded statement, Epifanio Solano, BCM's lead foreman, stated that at the time of the incident, he was moving a customer into Park Tower. (Shoolbraid Cert. Ex. D at 1.) Solano stated that BCM was required to check in with the property management company, and that the property provided Masonite to BCM and made BCM place the Masonite to protect a rug underneath. (*Id.* at 2.) Solano further stated, "the Masonite they had put down I was concerned about and the guy who put it down, the porter said it told me [sic] it was okay. It was the only Masonite they had. So we had to use what we had to use." (*Id.* at 2.) Solano further stated that

> they [Park Tower employees] made us put it down. They guy watched us put it down, told us where to put it exactly. That is when I showed my concern about the Masonite and he showed no concern… They stood there and watched me put it down until it was to their liking.

(*Id.* at 2-3.)

On September 9, 2021, BCM provided Northfield with a Liability Notice of Occurrence/Claim. (Shoolbraid Cert. Ex. E.) An Automobile Loss Notice was issued to Prime Property & Casualty on February 23, 2023. (*Id.* Ex. F.) On March 15, 2023, Prime sent a letter to BCM advising that Prime would not defend or indemnify BCM in the Underlying Action. (*Id.* Ex. G.) BCM advised that BCM failed to promptly notify Prime of the incident, as required under the Prime Policy. (*Id.* at 4.) The letter further stated that there was no causal connection between the injuries alleged in the Underlying Action and BCM's "use" of their automobile to conclude that the alleged injuries resulted from the "use" of an auto under the Prime Policy. (*Id.* at 5.) By letter dated March 16, 2023, Prime formally rejected Northfield's tender of coverage on BCM's behalf and communicated its position that (a) BCM failed to provide timely notice of the loss and (2) the injuries were not covered under the Prime Policy. (Shoolbraid Cert. Ex. H.) The parties in the Underlying Action ultimately settled and Northfield funded a "substantial portion" of the global

6

settlement in the Underlying Action. (DSMF ¶ 17; Compl. ¶ 20.)[2]

### D.  The Instant Action

Plaintiff filed this action on December 27, 2023. (ECF 1.) In its Complaint, Northfield seeks a declaration that Prime was obligated to defend and indemnity BCM in the Underlying Action and that the coverages provided by the Prime Policy are primary (Compl. ¶ 26); and an award for the recovery of all sums it paid in the defense and indemnification of BCM in the Underlying Action. (*Id.* ¶ 27.) On February 7, 2024, Prime filed an Answer to the Complaint. (ECF 6.) On June 6, 2025, Prime moved for summary judgment. (ECF 21.) On July 1, 2025, Northfield cross-moved for summary judgment and opposed Prime's motion for summary judgment. (ECF 23.) On August 15, 2025, Prime filed an opposition to Northfield's motion for summary judgment. (ECF 24.) On August 15, 2025, Northfield filed a reply brief in opposition to Prime's motion for summary judgment and in further support of its cross-motion for summary judgment. (ECF 25.)

### II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains.

---

[2]In its brief, Northfield represents that it provided a defense to BCM in the Underlying Action and ultimately agreed to fund $135,000 of a $180,000 global settlement reached in March 2023. (Northfield Br. at 2.) These facts are not, however, included in either party's Undisputed Statement of Material Facts or supported with evidence.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

### III.    ANALYSIS

#### A.  Choice of Law

The parties dispute whether New Jersey or Connecticut law applies. (*See* Prime Br. at 9-13; Northfield Br. at 5-8.) Prime argues that Connecticut law applies because this action bears a "significant connection" with Connecticut. (Prime Br. at 1.) Northfield conversely argues that New Jersey law should apply because both the Northfield and Prime Policies were negotiated and issued in New Jersey (Northfield Br. at 5-6), and that BCM's "brief [ ] involvement in Connecticut" does not create a significant connection to justify application of Connecticut law. (*Id.* at 7-8.)

"[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "New Jersey has adopted the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws[,]" which is a two-part test. *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013) (citations omitted).

If no actual conflict exists, or if New Jersey has the most significant relationship to the causes of action, New Jersey law applies. *See Caspersen ex rel. Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 36 (D.N.J. 2020). If a conflict exists, the court then proceeds to the second part of the test and "determine[s] which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco*, 709 F.3d at 207 (quoting *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008)). "Choice-of-law determinations are typically made on an issue-by-issue basis." *Supreme Oil Co. v. Mass Polymers Corp.*, Civ. No. 15-2344, 2016 WL 8679260, at *4 (D.N.J. Mar. 11, 2016) (citation omitted).

9

### 1. Determination as to Whether Conflicts of Law Exist

The Court finds that there is a conflict between relevant New Jersey and Connecticut law.

The first issue disputed by the parties is whether the events causing Wander's injuries are related to a "use" of the BCM vehicle such that the Underlying Action was encompassed by the Prime Policy. (*See* Prime Br. at 17.) New Jersey has adopted the "complete operation" doctrine, under which "loading and unloading" insurance "covers the entire process involved in the movement of goods, from the moment they are given into the [named] insured's possession until they are turned over at the place of destination to the party to whom delivery is to be made...." *Pisaneschi v. Turner Const. Co.*, 785 A.2d 50, 56–57 (N.J. Super Ct. App. Div. 2001) (quoting *Cenno v. W. Virginia Paper & Pulp Co.*, 262 A.2d 223, 226 (N.J. Super. Ct. App. Div. 1970)). "[A]ll that is required to establish coverage is that the act or omission which resulted in the injury was necessary to carry out the loading or unloading." *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Atl. States Ins. Co.*, No. A-3802-21, 2024 WL 1231691, at *3–4 (N.J. Super. Ct. App. Div. Mar. 22, 2024), *cert. denied*, 259 N.J. 374, 326 A.3d 788 (2024) (quoting *Kennedy v. Jefferson Smurfit Co.*, 688 A.2d 89, 92 (N.J. 1997)). "In such an analysis, 'the critical issue is whether' defendants' alleged acts or omissions were 'an integral part of the loading activity, and thus covered under the 'use' provision.'" *Id.* (quoting *Kennedy*, 688 A.2d at 92). Connecticut has also adopted the "complete operation" doctrine. *See Raffel v. Travelers Indem. Co.*, 106 A.2d 716, 719 (Conn. 1954); *Am. Med. Response v. New Hampshire Ins. Co.*, No. 95-0373810, 1997 WL 139452, at *4 (Conn. Super. Ct. Mar. 10, 1997). Therefore, there is no conflict between New Jersey and Connecticut as to interpreting the coverage of the Prime Policy.

However, there is a conflict between New Jersey and Connecticut law with regard to one of Prime's key defenses—that BCM failed to comply with the notice requirement condition of the

10

Prime Policy (the "Notice Requirement") and therefore Prime is not liable for providing coverage in the Underlying Action. (*See* Prime Br. at 13-16.) Under New Jersey law, "an insurer seeking to disclaim coverage based on late notice must show (1) a breach of the insurance contract's notice provision, and (2) a 'likelihood of appreciable prejudice' resulting from the breach." *GEA Mech. Equip. US, Inc. v. First State Ins. Co.*, No. 23-2062, 2024 WL 3738639, at *1 (3d Cir. Aug. 9, 2024) (quoting *Cooper v. Gov't Emps. Ins. Co.*, 237 A.2d 870, 874 (N.J. 1968)). Appreciable prejudice "requires two showings: one that 'substantial rights have been irretrievably lost,' and one that the insurer would have had a 'likelihood of success…in defending against the accident victim's claim.'" *Id.* (quoting *Morales v. Nat'l Grange Mut. Ins. Co.*, 423 A.2d 325, 329–30 (N.J. Super. Ct. Law Div. 1980)).

Similarly, under Connecticut law, "absent waiver, an unexcused, unreasonable delay by an insured in notification of a covered occurrence constitutes a failure of condition that entirely discharges an insurance carrier from any further liability on its insurance contract." *Arrowood Indem. Co. v. King ("Arrowood I")*, 605 F.3d 62, 77 (2d Cir. 2010). "Connecticut requires two conditions to be satisfied before an insurer's duties can be discharged pursuant to the 'notice' provision of a policy: (1) an unexcused, unreasonable delay in notification by the insured; and (2) resulting material prejudice to the insurer." *Id.* Thus, "a policyholder who fails to give timely notice of an insurable loss does not forfeit his coverage if…his delay did not prejudice his insurer." *Id.* (citation omitted). "[T]he insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision." *Arrowood Indem. Co. v. King ("Arrowood II")*, 39 A.3d 712, 725–26 (Conn. 2012).

Connecticut's "material prejudice" standard is, however, more permissive than New Jersey's. There is no requirement under Connecticut law for an insurer to show that it would have

11

had a 'likelihood of success...in defending against the accident victim's claim.' *GEA Mech. Equip.*, 2024 WL 3738639, at *1 (internal quotation omitted). Rather, "'[t]here is some authority that, in Connecticut, an insurer's inability to investigate facts that might reduce its liability constitutes material prejudice.'" *State Farm Fire & Cas. Co. v. Yoel*, No. 13-101, 2014 WL 4182614, at *7 (D. Conn. Aug. 21, 2014) (quoting *Arrowood I,* 605 F.3d at 79). Because the Court has found a conflict of law, it must engage in a significant relationship analysis.

### 2. Most Significant Relationship Analysis

New Jersey has "rejected the mechanical and inflexible *lex loci contractus* rule in resolving conflict-of-law issues in liability-insurance contracts. Instead, [New Jersey] courts have adopted a more flexible approach that focuses on the state that has the most significant connections with the parties and the transaction." *Formosa Plastics Corp., U.S.A. v. ACE Am. Ins. Co.*, No. 20-CV-14338, 2024 WL 4891740, at *10 (D.N.J. Nov. 25, 2024) (citing *Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 629 A.2d 885, 888 (N.J. 1993)). To determine which state has the most significant relationship, New Jersey courts consider the factors set forth in *Restatement (Second) Conflict of Laws* §§ 6, 188, and 193. *Id.* (citing *Spruance*, 629 A.2d at 888). The § 6 factors under the Restatement are:

> (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2). § 188 also lists several "contacts" to be considered in this analysis: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the

domicil, residence, nationality, place of incorporation and place of business of the parties. *Id.* § 188(2). Under § 193 of the Restatement,

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Id.* § 193. "New Jersey generally interprets casualty-insurance policies in accordance with the law of the state in which the insured risk is principally located, unless some other state has a more significant relationship to the transaction and the parties as illuminated by the consideration of factors listed in § 6." *Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 165 (3d Cir. 1999). "Restatement section 188 provides the choice-of-law rule in respect of contracts in general, [whereas] Restatement section 193 provides guidance in applying section 188's 'relevant contacts' to the special case of casualty-insurance contracts." *Formosa Plastics*, 2024 WL 4891740, at *10 n.12 (citing *Spruance*, 629 A.2d at 888).

Relying on the New Jersey Supreme Court's decision in *State Farm Mut. Auto. Ins. Co. v. Simmons' Est.*, Northfield argues that New Jersey law applies because it was the place of contracting for both Policies. (Northfield Br. at 5-6 (citing *State Farm Mut. Auto. Ins. Co. v. Simmons' Est.*, 417 A.2d 488, 492–93 (N.J. 1980)).[3] Prime conversely argues that the application of the factors in § 188 and § 6 require application of Connecticut law because Connecticut bears the most significant relationship to this action. (Prime Br. 12-13.)

---

[3] The *Simmons* decision is not dispositive. In *Simmons,* "the New Jersey Supreme Court warned that the 'place of contract' rule was not the end-all and be-all of choice-of-law determinations for insurance contracts." *Pittston Co. v. Allianz Ins. Co.*, 795 F. Supp. 678, 685 (D.N.J. 1992). Instead, *Simmons* emphasized that, for automobile insurance, "the location of the risk, the place of contract, and the parties' reasonable expectations will generally coincide with respect to such policies." *Id.*

As directed by applicable law, the Court therefore starts its analysis with the principal place of insured risk under § 193 of the Restatement. § 193 recognizes that automobiles are intrinsically moveable chattels, but still directs courts to view the place where the insured automobile is garaged as its "principal location." *Id.* cmt. b. "[I]n the case of an automobile liability policy, the parties will usually know beforehand where the automobile will be garaged, at least during most of the period in question." *Id.* The place where the insured automobile is garaged is therefore considered "the most important contact to be considered in the choice of applicable law." *Id.* Here, the Prime Policy insured two vehicles, both of which are listed in the Prime Policy as garaged in Clifton, New Jersey. (Shoolbraid Ex. A at 5.)

This factor is not dispositive, however, since the insured chattels are moveable. "[T]he importance of the principal location of the insured risk diminishes when the insured object is a moveable chattel, such as a motor vehicle." *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 173 (3d Cir. 2011), *as amended* (Dec. 9, 2011). In those cases, "the significance of the state of the risk's principal location diminishes with the length of time that it can be anticipated the chattel will be in other states during the term of the insurance." *Restatement* § 193 cmt. b. "[E]very automobile insurer is on notice that because of the mobility both of automobiles and their owners, the circumstances of a particular loss may well result in the applicability of the law of a state other than that in which the policy was issued[.]" *Fogel*, 656 F.3d at 175–76 (citing *New Jersey Mfrs. Ins. Co. v. MacVicar*, 704 A.2d 1343, 1347 (N.J. Super Ct. App. Div. 1998)). The mobility of BCM's automobiles is particularly salient here, where BCM used its automobiles in service of its moving business and contemplated, in the Prime Policy, a radius of up to 150 miles. (Shoolbraid Ex. A at 5.)

14

Because § 193 is not dispositive, the Court turns next to § 188. The contacts for consideration under § 188 support the application of New Jersey law. Neither party to this action is incorporated or domiciled in New Jersey or Connecticut, and the insured in domiciled in New Jersey. (*See* Shoolbraid Cert. Ex. A.) The Prime Policy and Northfield Policy were both issued in New Jersey. (*See id.*; Buckley Cert. Ex. A.) The Prime and Northfield Policies agreed to provide certain coverage to BCM, but the jurisdiction of potential lawsuits was uncertain given the nature of BCM's business. (Shoolbraid Cert. Ex A; Buckley Cert Ex. A.) Although the Underlying Action was the impetus for the instant matter, "the issue [before the Court] is the intent of the parties [and BCM] when they allocated risks in the policy." *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 235–36 (3d Cir. 2010) (applying Pennsylvania law).

Consideration of the factors in § 6 also favor application of New Jersey law. "Insurance law policy deals primarily with the proper standards and procedures for the fair interpretation of the insurance contract, accounting for the interests of the insurer, the insured, and the public." *NL Indus., Inc. v. Com. Union Ins. Co.*, 65 F.3d 314, 328 (3d Cir. 1995). The core of this case relates to the rights and obligations of the Plaintiff and Defendant under their respective Policies, not Toby Winder's Connecticut case. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 235 (3d Cir. 2007) ("We are [primarily] concerned with the contract of insurance[.]") (quotation omitted) (alteration in original) (applying Pennsylvania law); *Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379–80 (3d Cir. 1992) (applying Pennsylvania choice-of-law rules and finding that New York rather than Pennsylvania law applied because "[a]lthough the underlying trial and settlement negotiations took place in Pennsylvania, all of the parties to this litigation reside elsewhere, and the contract of insurance was presumably delivered in New York.").

15

Nor does Northfield's claim here implicate Connecticut's interests. No parties are Connecticut residents; the policies were issued in New Jersey; and the insured has already settled the Underlying Action, in Connecticut, with a payout to the injured Connecticut resident. (*See* Compl.; Shoolbraid Ex. A; Buckley Ex. A.) Moreover, the protection of justified expectations and predictability and uniformity of result favor application of New Jersey law where, as here, the core issues relate to interpretation of New Jersey contracts. *See Moper Transp., Inc. v. Norbet Trucking Corp.*, 943 A.2d 873, 879–80 (N.J. Super. Ct. App. Div. 2008) ("[O]ur choice-of-law principles point to the law of New Jersey in this declaratory judgment action where the issue is which carrier provides coverage…as between the carriers in this action dealing with loss allocation under policies issued to New Jersey insureds under a contract expressly governed by New Jersey law, we do not believe New York has the greater governmental interest.") (citations omitted).

These factors distinguish this case from *Conn. Indem. Co. v. Carela*, upon which Prime relies. (*See* Prime Br. at 13; Prime Reply at 6-7 (citing *Carela*, No. 05-1988, 2007 WL 2363123, at *5 (D.N.J. Aug. 15, 2007).) In *Carela*, the Court's analysis of the § 6 factors focused on making whole the victims of the negligent operation of motor vehicles, which is not at issue here. *See Carela*, 2007 WL 2363123, at *5 ("New York's policy of protecting innocent drivers on its roads would be severely weakened if the Court found…that New Jersey's interest in the matter somehow controlled."). Further, in *Carela*, the policy holder was from New York; the vehicle accident giving rise to the litigation occurred in New York; and everyone in the accident was a New York resident. *Id.* The policy holder parked his car in New Jersey and negotiated an insurance policy with a New Jersey broker, but the action had no other connection to New Jersey. *Id.*

For the above-mentioned reasons, the Court will apply New Jersey law.

16

### B. Application of the Prime Policy to Toby Wander's Injuries

Northfield argues that Toby Wander's injuries were the direct result of "unloading" items from the BCM vehicle and therefore the Prime Policy, not the Northfield Policy, applies. (Northfield Br. at 8-11.) Prime argues that Wander's injuries did not arise from BCM's "use" of the vehicle. (Prime Br. at 19-23.)

The Court agrees with Northfield that the Prime Policy covers Wander's injuries in the Underlying Action. The Prime Policy's Covered Autos Liability Coverage provides that:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

(DSMF ¶ 2; Shoolbraid Cert. Ex. A at 8.) New Jersey typically defines "use" of a vehicle to include its loading and unloading. *Kennedy*, 688 A.2d 89, 91. "Under New Jersey's 'complete operation' doctrine, 'loading and unloading' insurance 'covers the entire process involved in the movement of goods, from the moment they are given into the [named] insured's possession until they are turned over at the place of destination to the party to whom delivery is to be made....'" *Pisaneschi*, 785 A.2d at 56–57 (quoting *Cenno*, 262 A.2d 223). "Any accident occurring during and arising out of the process of loading or unloading the insured vehicle is covered[.]" *Id.* Under this standard, "the distinction between preparations for loading and the act of loading is obliterated." *Kennedy*, 688 A.2d 89, 92 (citations omitted).

However, "accidents that are the result of preexisting unsafe conditions unrelated to the unloading itself will not give rise to coverage under an auto insurance policy simply because they occur during an unloading." *Burlington Ins. Co. v. Northland Ins. Co.*, 766 F. Supp. 2d 515, 525 (D.N.J. 2011) (citing *Wakefern Food Corp. v. General Acc. Group*, 455 A.2d 1160 (N.J. Super. Ct. App. Div. 1983)). Prime argues that the injury resulted from the faulty Masonite flooring—a

17

pre-existing unsafe condition. (Prime Br. at 21-23.) But here, Wander was injured from falling on Masonite Park Tower required for the purpose of facilitating BCM's customer's move. (*See* Shoolbraid Cert. Exs. C & D; Buckley Cert. Ex. D.) Epifanio Solano, BCM's employee, stated that Park Tower required Masonite and that the Park Tower property manager instructed Solano as he put down the Masonite. (Shoolbraid Cert. Ex. D. at 2.) Because the Masonite was only placed for purposes of moving BCM's customer into Park Tower, the Court finds that the injury was related to BCM's use of the vehicle, *i.e.*, the complete operation of loading and unloading the vehicle for its customer's move.

This fact distinguishes this case from *Wakefern Food Corp. v. Gen. Acc. Grp.*, upon which Prime relies. (Prime Br. at 20-21 (citing *Wakefern*, 455 A.2d 1160).) In *Wakefern*, the driver of the insured vehicle tripped over "debris consisting of a pallet, cardboard and excess wires" that were present at the unloading dock. *Id.* at 1162. The *Wakefern* court concluded that the "cause of the accident, the hazardous condition of debris permitted by Wakefern to exist, was not, within reason, a condition necessary to the act of unloading nor had it *any* reasonable connection to that work." *Id.* at 1164 (internal quotation omitted) (emphasis in original). Unlike the debris in *Wakefern*, here the Masonite flooring was placed only to facilitate BCM's unloading of the insured vehicle.

### C.  The Prime Policy's "Handling Of Property" Exclusion

Although the Court has found that the Prime Policy covers the underlying accident, the inquiry is not yet done. Prime also argues that there is no coverage for the Underlying Action under its policy because of the Prime Policy's "Handling of Property" Exclusion. (Prime Br. at 23-24.)

Under New Jersey law, the interpretation of an insurance policy is a "question of law." *N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co.*, 499 F. Supp. 3d 74, 78 (D.N.J. 2020) (quoting *Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med.*, 46 A.3d 1272, 1276 (N.J.

2012)). An insurance policy should be "interpreted according to its plain and ordinary meaning." *Id.* (quoting *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260 (N.J. 1992)).

The Prime Policy contains a "Handling of Property" exclusion, which states that the Prime Policy does not apply to "bodily injury" or "property damage" resulting from the handling of property "[b]efore it is moved from the place where it is accepted by the "insured" for movement into or onto the covered 'auto'" or "[a]fter it is moved from the covered 'auto' to the place where it is finally delivered by the 'insured.'" (DSMF ¶ 4; Shoolbraid Cert. Ex. A at 10.) Prime argues that the "Handling of Property" exclusion applies to bar Prime coverage because "Wander sustained her injuries after BCM finished unloading furniture from its vehicle and transported it to the twenty-second floor of Park Tower, which is the location of the accident." (Prime Br. at 24; *see also* Prime Opp. at 12-14.) Northfield argues that the unloading process was not complete when Wander fell (Northfield Opp. at 11-13); Wander testified that there was a "huge amount of furniture, boxes, men shouting" on the twenty-second floor when her accident occurred. (Buckley Cert. Ex. D; PSMF ¶ 6.)

Based on the record before the Court, there is a genuine issue of material fact as to whether BCM had completed its delivery of the property when Wander fell. It is unclear from Solano's statement or Wander's statement whether BCM had dropped the property to its final destination when the incident occurred. The Court denies both parties' motions for summary judgment based on this factual dispute.

### D. The Prime Policy's Notice Requirement

Under the terms of the Prime Policy, BCM was required to provide "prompt notice" to Prime at the time of an "accident" or "loss" under the policy. (Shoolbraid Cert. Exs. A & F; DSMF ¶ 14.) The Prime Policy's "Duties in the Event of Accident, Claim, Suit Or Loss" condition states

that Prime will "have no duty to provide coverage" unless the insured has been in "full compliance" with several duties, which includes giving Prime "prompt notice of the 'accident' or 'loss'." (Shoolbraid Cert. Exhibit A at 14.) Prime received notice on February 23, 2023, a year and four months after the Underlying Action was filed in Connecticut state court. (*Id.* Ex. F; *see also* DSMF ¶ 5; Shoolbraid Cert. Ex B.) Prime argues that it suffered appreciable prejudice due to this delay and therefore was not obligated to provide coverage. (Prime Br. at 14-17.) Northfield does not dispute that BCM did not provide "prompt notice," as required under the Prime Policy, but contends that Prime did not suffer "appreciable prejudice" from the delay. (Northfield Br. at 13-14.)

Under New Jersey law, "an insurer seeking to disclaim coverage based on late notice must show (1) a breach of the insurance contract's notice provision, and (2) a 'likelihood of appreciable prejudice' resulting from the breach." *GEA*, 2024 WL 3738639, at *1 (quoting *Cooper*, 237 A.2d at 874). Appreciable prejudice "requires two showings: one that 'substantial rights have been irretrievably lost,' and one that the insurer would have had a 'likelihood of success…in defending against the accident victim's claim.'" *Id.* (quoting *Morales*, 423 A.2d at 329–30).

For the first factor, Prime argues that it was prejudiced by the late notice because "it was given little to no time to interview witnesses, like Northfield had the opportunity to do, discover more information about the accident, aside from Northfield's production of its documents regarding the claim, nor inspect the site of the accident in its state immediately or soon preceding the accident to preserve relevant evidence." (Prime Br. at 16.) In response, Northfield argues that Prime had access to Solano's statement and Wander's deposition. (Northfield Br. at 14.) Northfield further argues that "Prime was given the opportunity to participate in settlement discussions, but instead chose to deny coverage and walk away." (*Id.*; *see also* Northfield Opp. at 10.) In response,

20

Prime argues that "Northfield provides no support for this proposition" and "the discovery record of this case merely reflects that Northfield offered Prime Property & Casualty the opportunity to *contribute* to the settlement that it maintained control over." (Prime Reply at 10 (emphasis in original).) The Court concludes that there are issues of material fact related to whether Prime's substantial rights were irretrievably lost by the late notice. While it is true that "the carrier must establish more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim," because Prime received notice in close temporal proximity to the settlement in the Underlying Action, the Court cannot conclude whether its rights were or were not irretrievably lost. *See Morales*, 423 A.2d at 329–30.

The Court also finds issues of material fact related to the second factor. It is possible that Prime may have been able to disclaim coverage based on the "Handling of Property" coverage or may have been able to apportion a greater percentage of the eventual settlement to Park Tower, among other possibilities. Based on the facts on the current record, however, the Court cannot make a conclusion about the likelihood of Prime's success. Therefore, the Court denies both parties' summary judgment motions on this additional basis.

### E.  Equitable Indemnification and Contribution

The Court agrees with Prime that Northfield cannot maintain a claim for equitable indemnification and contribution from Prime. (Prime Br. at 25-27.). Northfield's claim is properly characterized as one of equitable subrogation. Contribution and subrogation "are distinct legal concepts." *Houston Cas. Co. v. Kinsale Ins. Co.*, No. 24-7866, 2025 WL 2779139, at *6 (D.N.J. Sept. 30, 2025). Indemnity and contribution rights are "only available when multiple *insurers or indemnitors* share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation." *Liberty Int'l Underwriters Canada v. Scottsdale Ins. Co.*, 955 F. Supp.

21

2d 317, 329–30 (D.N.J. 2013). On the other hand, subrogation is "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies or securities." *Id.* at 327. "Subrogation applies where multiple insurers cover different risks." *Houston*, 2025 WL 2779139, at *6 (citing *Sentry Select Ins. Co. v. Clark*, 2021 WL 2472705, at *7 (D.N.J. June 17, 2021)). Northfield and Prime insured BCM for different risks. (*Compare* Shoolbraid Cert. Ex. A *with* Buckley Cert. Ex. A.) The Court therefore treats Northfield's claim as one for equitable subordination.

### F.  Equitable Subordination

To establish equitable subrogation in New Jersey, a plaintiff must show that (1) it paid a debt to a third party for which it was not primarily liable, (2) 'in the performance of a legal duty or for the protection of a legal right,' (3) and not as a 'mere stranger or volunteer,' (4) it paid the debt in full, and (5) equity favors subrogation." *Merrick Bank Corp. v. Valley Nat'l Bank*, No. CV 13-7756, 2017 WL 5951583, at *11 (D.N.J. Nov. 30, 2017) (quoting *Schmid v. First Camden Nat'l Bank & Trust Co.*, 22 A.2d 246, 254 (N.J. Ch. 1941)). Prime argues that equitable subrogation fails here because (a) Northfield's coverage position renders it a volunteer and (b) Northfield did not meet its burden that Prime wrongfully refused to defend BCM. (Prime Reply at 7-11.)

Generally, subrogation applies where a party, "not acting voluntarily, but under some compulsion" pays a debt or discharges an obligation for which another is primarily liable and which "in equity and good conscience ought to be discharged by the latter." *Jorge v. Travelers Indem. Co.*, 947 F. Supp. 150, 155 (D.N.J. 1996) (internal quotations and citations omitted). "A payor is not a volunteer if it is acting under compulsion to protect its own interests. *Id.* (citing *Prairie State Bank v. United States,* 164 U.S. 227, 231 (1896)). The court in *Jorge* noted that a

22

payor's desire to avoid potential liability or at least a complex lawsuit was sufficient to avoid volunteer status, as were interests in protecting a business relationship with the insured and "avoid[ing] an entanglement in insurance coverage litigation." *Id.* at 155-56 (citations omitted). Prime argues that Northfield's allegations in the Complaint admit that it acted as a volunteer in providing BCM a defense and settlement in the Underlying Action. (*See* Prime Reply at 9 (citing Compl. ¶ 21).) The Court does not find Northfield's statements in its Complaint conclusive. Instead, there are genuine issues of material fact as to how Northfield's understanding of its own liability when it provided settlement funds for the Underlying Action.

Next, Prime's argument that Northfield did not meet its burden to wrongfully defend BCM treats a subset of the "volunteer" analysis as a separate requirement. The Court in *Sentry Select Ins. Co. v. Clark* discussed the requirement set forth by the New Jersey Appellate Division in *Rooney v. West Orange Township* that "an excess insurer seeking reimbursement from a primary insurer for litigation and/or settlement costs must first demand that the primary insurer defend the underlying litigation, and the primary insurer must wrongfully refuse to defend." 2021 WL 2472705, at *6 (citing *Rooney v. West Orange Township*, 491 A.2d 23, 26 (N.J. Super Ct. App. Div. 1985)). The *Sentry* court explained that the "*Rooney* court found that an excess insurer who defends a lawsuit does so as a volunteer unless the excess insurer demands that the primary insurer defend the lawsuit and the primary insurer 'wrongfully refuses' to do so." *Id.* at *8 (citing *Rooney*, 491 A.2d 23). "In other words, the *Rooney* court found that the absence of a wrongful refusal determines conclusively that an excess insurer acts as a volunteer." *Id.*

The *Sentry* Court noted that *Rooney*, however, "did not consider whether an excess insurer acts voluntarily when it defends an insured in litigation while believing it is the primary insurer." *Id.* Therefore, *Rooney*'s holding "does not explain how an excess insurer can forfeit its subrogation

rights by failing to obtain wrongful refusal from another insurance company whose contractual duties are unknown." *Id.* Here, the record is unclear as to when Northfield learned of the Prime Policy or when Northfield determined that the Prime Policy was primary. Even if Northfield determined that the Prime Policy was primary before it provided the settlement funds for the Underlying Action, based on the open factual questions regarding the Handling of Property Exception and the Notice Requirement breach, the Court cannot conclusively determine whether Prime wrongfully refused to defend or fund the Underlying Action.

Finally, the Court must determine whether equity favors subrogation. This case is different from others in the insurance context because the insured already received coverage and the injured third-party, Toby Wander, has already received settlement monies. Northfield's delay alerting Prime to its potential liability and its funding of the settlement so soon after alerting Prime to Prime's potential liability (*see* Shoolbraid Cert. Ex. F) certainly create questions for the Court regarding the equity factor. However, based on this record—particularly the limited communications between Northfield and Prime on the record—the Court cannot make a determination on equity at this time.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, Defendant's motion for summary judgment (ECF 21) is **DENIED**. Plaintiff's cross-motion for summary judgment (ECF 23) is also **DENIED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:   Clerk
cc:     Leda D. Wettre, U.S.M.J.
        Parties